**The below described is SIGNED.**



**Dated: September 14, 2009**

_____
**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE:<br><br>**ROBERT JOHN LUSK**,<br><br>Debtor. | Bankruptcy Case No. 06-23085<br><br>Chapter 7<br><br>Adversary No. 06-2557 |
| **PETER M. HAUSER**,<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT JOHN LUSK**,<br><br>Defendant. | Judge Judith Boulden |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff in this proceeding, Peter M. Hauser (Plaintiff), seeks a determination that the debt owed to him by Robert John Lusk (Defendant) is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(6), and also seeks denial of the Defendant's discharge pursuant to § 727(a)(2), (a)(4), and (a)(5).[1]  Following a four-day trial, the Court took the matter under advisement.  After considering the evidence, assessing the credibility of the witnesses, considering the arguments of

---

[1]    All future statutory references are to title 11 of the United States Code unless otherwise indicated.

counsel, and conducting an independent review of applicable case law, the Court makes the following

findings of fact and conclusions of law.

## I.    JURISDICTION

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334.  This is a core

matter within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J).  The jurisdiction of the Court is

not disputed and is appropriate.  Under the provisions of 28 U.S.C. § 1408 and §1409, venue of

this proceeding is proper in this Court.

## II.    FINDINGS OF FACT

The following findings of fact are established by admissions in the pleadings, by stipulation

of counsel, or through testimony or evidence provided at trial:[2]

The Promissory Notes and StudentAthlete, Inc./StudentAthlete.com

*1.    On or about August 7, 2001, in consideration of loans made by the Plaintiff, the

Defendant executed a promissory note in favor of the Plaintiff (the Original Note).  The Original

Note was secured by a Short Form Deed of Trust and Assignment of Rents (the Deed of Trust)

executed by the Defendant as Trustor regarding the real property commonly known as 1867

Bayport Way, Newport Beach, California (Newport Beach Property).

*2.    The Defendant and his wife, Julie Lusk, acquired the Newport Beach Property in

December 1997 for $535,000.

3.    The Plaintiff prepared the Deed of Trust, and there is no signature line for Julie

Lusk on the document.

---

[2]    The uncontroverted facts provided to the Court in the parties' Joint Pretrial Order, with minor stylistic
changes, are marked with an asterisk.

4.    Although the Plaintiff asserts otherwise, the Court finds that the Defendant told the Plaintiff that Julie Lusk would not sign the Deed of Trust and that it might be an ineffective lien against the property.

5.    The Plaintiff did not record the Deed of Trust at the time the Defendant executed it.

6.    At the time of this initial transaction, the Plaintiff was employed as a real estate broker.  He had been working in the real estate field since 1982.

*7.    On October 4, 2002, the Defendant and the Plaintiff entered into an agreement relating to repayment of the funds advanced by the Plaintiff to the Defendant including the Original Note (Agreement).  The Agreement also contained a provision whereby the Defendant released the Plaintiff in connection with any defenses to repayment of the prior advances.

*8.    On October 4, 2002, for good and valuable consideration and to carry out the terms of the Agreement, the Defendant made, executed and delivered a Promissory Note (First Promissory Note) to the Plaintiff.  By the First Promissory Note, the Defendant agreed to pay the Plaintiff the principal sum of $157,944.05, plus interest at the rate of ten percent (10%) per annum.  By its terms, the First Promissory Note supercedes the Original Note.  The First Promissory Note also specifically provides that it was secured by the Deed of Trust.

*9.    The First Promissory Note provides for the following payments: $100,000 plus accrued interest was due to be paid by the Defendant to the Plaintiff on January 4, 2004, and the balance plus accrued interest was due to be paid by the Defendant to the Plaintiff on January 4, 2005.

*10.    On October 9, 2002, for good and valuable consideration, the Defendant made, executed and delivered a second Promissory Note (Second Promissory Note) to the Plaintiff.  By

the Second Promissory Note, the Defendant agreed to pay the Plaintiff the principal sum of

$15,000, plus interest at the rate of ten percent (10%) per annum, on or before May 9, 2004.

*11.    On November 5, 2002, for good and valuable consideration, the Defendant made,

executed and delivered a third Promissory Note (Third Promissory Note) to the Plaintiff.  By the

Third Promissory Note, the Defendant agreed to pay the Plaintiff the principal sum of $35,000,

plus interest at the rate of ten percent (10%) per annum, on or before August 16, 2004.  The First

Promissory Note, the Second Promissory Note, and the Third Promissory Note collectively are

referred to as the "Promissory Notes."

*12.    The Defendant failed to make any of the payments due to the Plaintiff under the

Promissory Notes from any source at any time.  The Defendant is in default under the terms of the

Promissory Notes.

*13.    The Plaintiff did not attempt to record the Deed of Trust from August 2001

through late 2002.

*14.    Although the Plaintiff contends that there were numerous verbal communications,

there are no written or electronic copies of any documents referencing the Deed of Trust after the

Agreement was executed in October 2002 through November 29, 2005 when the Plaintiff filed an

action against the Defendant in the California state court (California State Court Action).

*15.    Although the Plaintiff contends that there were numerous verbal communications,

there are no written or electronic copies of any demands for payment of the Promissory Notes

after they became due in 2004 through November 29, 2005 when the Plaintiff filed the California

State Court Action.

*16.    Prior to execution of the Promissory Notes, the Plaintiff had personally known the

Defendant for approximately five years.

*17.    The Plaintiff had coached the Defendant's son in Junior All-American Football.

*18.    The Plaintiff and the Defendant both served as coaches on the same Little League team for which their sons played.

*19.    The Plaintiff also knew the Defendant professionally, having sold real property for the Defendant and the Defendant's family.

20.    The funds the Plaintiff advanced to the Defendant were to be used to fund the Defendant's business StudentAthlete, Inc. or StudentAthlete.com (StudentAthlete) — a web-based business that would place prospective college athletes in touch with recruiters and college athletic departments.

21.    The Defendant worked on the implementation and development of StudentAthelete until early 2004.

<u>The Reconciliation Agreement and the Sale of the Newport Beach Property</u>

22.    The Defendant and Julie Lusk had been separated for a period of one-and-a-half years between early 2001 and the spring or summer of 2002.

23.    As a result of the separation, Julie Lusk was concerned about her future financial stability and that of her children.  She desired to exercise control over the family finances.

24.    The couple decided to reconcile, and at Julie Lusk's request, the Defendant executed a document called the Reconciliation Agreement.

25.    The Reconciliation Agreement was subsequently lost, but the material terms of that agreement were as follows:

        a.    The Lusks would move to Utah.

        b.    The Lusks would purchase a home in Utah in Julie Lusk's name

only so that she would have a place to live and to raise her children if the reconciliation between the Defendant and Julie Lusk was unsuccessful.

        c.      The Defendant would investigate the LDS Church to which Julie Lusk belonged.

26.    Although the timing is somewhat unclear, the Plaintiff asserts that at the time of the execution of the Second and Third Promissory Notes, which would be subsequent to the Lusk's reconciliation, the Plaintiff informed the Defendant that he was going to record the Deed of Trust.

27.    The Plaintiff asserts that the Defendant represented to him that he was getting ready to sell the Newport Beach Property, that recording the Deed of Trust would unnecessarily interfere with the sale, that the Defendant had substantial equity in the Newport Beach Property, that it was not necessary for the Plaintiff to record the Deed of Trust in order to get paid, and that the Defendant would pay the Plaintiff from the proceeds of the sale of the Newport Beach Property after he arrived in Utah.  The Plaintiff asserts that he relied on these representations and did not record the Deed of Trust.

28.    Based upon the credibility of the witnesses, consideration of all the evidence, and as more fully explained below, the Court finds that the Defendant did not make the representations set forth in paragraph 27.

29.    Based upon the credibility of the witnesses, consideration of all the evidence, and as more fully explained below, the Court finds that the Plaintiff did not fail to record the Deed of Trust because the Defendant made the representations set forth in paragraph 27.

*30.    On March 6, 2003, the Defendant and Julie Lusk sold the Newport Beach Property for $1,039,000.00.

31.    Before selling the Newport Beach Property, the Defendant and Julie Lusk both thought that title to the property was held by them as community property.

*32.    At the time the Newport Beach Property was sold, title had been vested as "Robert Lusk and Julie Lusk, husband and wife as joint tenants."

*33.    The net proceeds generated from the sale of the Newport Beach Property after payment of all liens, commissions, and costs of sale totaled $414,284.86 (Proceeds).

*34.    None of the Proceeds were paid to the Plaintiff.

*35.    From the Proceeds, $194,457.08 was paid by escrow to Julie Lusk via check. This check was deposited into an account held in the name of Julie Lusk only (Zions Account).

36.    The $194,457.08 deposit into Julie Lusk's account was done pursuant to the Reconciliation Agreement the Defendant and Julie Lusk entered into in the spring or summer of 2002.

37.    Julie Lusk transferred approximately $41,000 of the $194,457.08 into a StudentAthlete account at Wells Fargo Bank to be used for further development and implementation of that business.

*38.    The remaining $219,827.78 of Proceeds were transferred directly from the escrow handling the sale of the Newport Beach Property to an escrow in Utah handling Julie Lusk's purchase of real property commonly known as 623 West Lake View Drive, Alpine, Utah 84004 (Alpine Property).

*39.    In March 2003, the Defendant moved to Utah with Julie Lusk and their children.

40.    The Defendant was still attempting to develop and market StudentAthlete when the Lusks moved to Utah.

41.      Julie Lusk used a portion of the Proceeds in her control to pay off some of the StudentAthlete debt as the Lusks were leaving California.

### The Alpine Property

*42.      On or about March 6, 2003, Julie Lusk purchased the Alpine Property for approximately $535,000.00.

*43.      Title to the Alpine Property was taken in the name of "Julie S. Lusk, a married woman."

*44.      In August 2004, Julie Lusk refinanced the Alpine Property and took out cash.  The face amount of the new loan from GreenPoint Mortgage Funding (GreenPoint) was $61,651.56 more than the previous loan obtained through Countrywide Mortgage.

*45.      In December 2004, Julie Lusk took out a $36,000 loan from Zions First National Bank (Zions) secured by a second-in-priority deed of trust against the Alpine Property.

*46.      In February 2006, Julie Lusk refinanced the Alpine Property and took out cash by borrowing $538,000 from American Brokers Conduit (American Brokers).  The face amount of this loan was $117,000 more than the sum of the GreenPoint and Zions loans.

*47.      Through the refinancings involving GreenPoint, Zions, and American Brokers, the amount of equity in the Alpine Property was reduced by approximately $214,650.

*48.      On or about April 26, 2006, Julie Lusk sold the Alpine Property for $697,000 which amount was $162,000 more than the purchase price.

*49.      The net cash received from escrow after the sale of the Alpine Property was $113,832.36.

*50.      While Julie Lusk was on the title, the Defendant lived in the Alpine Property with her and their children.

51.    The Defendant did not disclose any beneficial or equitable interest in the Alpine Property in his schedules (Schedules) or statement of financial affairs (SOFA) (collectively "Schedules and Statements") because he did not believe he had an interest in the property.

<u>The American Fork Property</u>

*52.    In or prior to August 2006, Julie Lusk purchased the real property commonly known as 122 S. 930 E., American Fork, Utah 84003 (American Fork Property) for approximately $246,000.

*53.    Title to the American Fork Property was taken in the name of "Julie Lusk."

*54.    At least $47,500 of the proceeds from the sale of the Alpine Property were used toward the purchase of the American Fork Property.

*55.    From approximately August 2006 through April 2007, the Defendant lived in the American Fork Property with Julie Lusk and their children.

56.    The Defendant did not disclose any beneficial or equitable interest in the American Fork Property in his Schedules and Statements because he did not believe he had an interest in the property.

<u>The Highland Property</u>

*57.    In or about February 2006, Julie Lusk decided to purchase a new home being constructed by Castle Builders, Inc. (Castle Builders) in Highland, Utah.  In connection with this decision, Julie Lusk paid $1,000 to Castle Builders for "plan engineering changes."

*58.    In or about May 2006, Julie Lusk executed a Real Estate Purchase Contract with Castle Builders (the Castle Contract) to purchase the real property commonly known as 4076 Shoreline Drive, Highland, Utah (Highland Property).  The Defendant's name appeared on the

Castle Contract as a buyer; however, the Defendant never signed the Castle Contract.  The original purchase price for the Highland Property was $580,000 after upgrades.

*59.    In connection with the execution of the Castle Contract, an additional $25,000 deposit was paid by Julie Lusk to Castle Builders.  Payments totaling at least an additional $8,830 also were made by Julie Lusk to Castle Builders in connection with the Castle Contract.

*60.    On or about May 28, 2006, an addendum to the Castle Contract was executed by Julie Lusk (Addendum 1).  Addendum 1 identified Rob Lusk and Julie Lusk as the buyers and requested that Castle Builders provide a price for certain identified additional upgrades.

*61.    Addenda 2-5 to the Castle Contract identified or referred only to Julie Lusk as the buyer.

*62.    The Defendant's Schedules and Statements (including Schedule A) do not disclose any beneficial interest in the Highland Property.

*63.    The Defendant's Schedules and Statements (including the Defendant's response to Question 10 regarding other transfers) disclose no transfers within the one-year period prior to bankruptcy.

64.    The purchase of the Highland Property was orchestrated by Julie Lusk, and she took the necessary steps to effectuate its purchase.

65.    Jacob Schoffe was hired to finish the basement in the Highland Property.  He testified that the Defendant was involved in hiring him and overseeing the completion of the basement, but that Julie Lusk was also involved.

66.    The Defendant had limited involvement in the purchase of the Highland Property, and any actions he took in relation to its building and purchase were for the purpose of assisting his wife at her request.

*67.   On or about March 21, 2007, Addendum 5 was executed replacing Catherine Staker as the buyer of the Highland Property.

*68.   Julie Lusk's maiden name was Staker.  Catherine Staker is married to Julie Lusk's brother, Joseph Staker.

*69.   On or after April 13, 2007, Catherine Staker obtained a loan from  Taylor Bean to pay Castle Builders and complete her purchase of the Highland Property.

*70.   The amount of the loan obtained by Catherine Staker from Taylor, Bean & Whitaker was approximately $619,200.

*71.   Ms. Staker has not used her own money for any cost or expense associated with the Highland Property including its purchase, maintenance, debt service, insurance, utilities, and taxes.

*72.   All costs and expenses associated with the Highland Property including its purchase, maintenance, debt service, insurance, utilities, and taxes have been paid by Julie Lusk transferring funds to Ms. Staker from account(s) held by Julie Lusk.

*73.   At all times since April 2007, the Defendant has lived in the Highland Property with Julie Lusk and their children.

74.   The Lusks have lived in the property pursuant to a verbal rental agreement between Catherine Staker and the Lusks.  Each month, the Lusks were to pay Catherine Staker $3,700 (the amount of the mortgage payment) to rent the Highland property.

75.   The Defendant did not disclose any beneficial or equitable interest in the Highland Property in his Schedules and Statements because he did not believe he had an interest in the property.

<u>The Payroll Deposits</u>

*76.    All compensation earned by the Defendant after moving to Utah in March 2003 (Payroll Deposits) was deposited into the Zions Account held in the name of only Julie Lusk.

77.    The Defendant admitted that he used the funds in the Zions Account for family and personal expenses but that Julie Lusk controlled the Zions Account.

78.    The Defendant's Schedules and Statements do not disclose the Payroll Deposits, nor does Schedule B disclose any beneficial interest in the Zions Account.

79.    At the time of filing the bankruptcy case, the Defendant did not believe he had an interest in the Zions Account because it was and had been controlled by Julie Lusk, consistent with her desire to exercise control over the family finances.

<u>The California State Court Action</u>

*80.    On November 29, 2005, the Plaintiff filed suit against the Defendant in the Superior Court for the State of California, County of Orange commencing case number 05CC12603 which has been referred to as the California State Court Action.  The California State Court Action sought damages from the Defendant arising from non-payment of the Promissory Notes.  The State Court Action did not reference the Deed of Trust and did not contain a cause of action for fraud.

*81.    On December 31, 2005, the Defendant filed a cross-complaint against the Plaintiff in the State Court Action (Cross-Complaint).  In the Cross-Complaint the Defendant alleged that the Plaintiff breached "oral" agreements entered in the summer of 2000 to pay "finder's or referral fees" to the Defendant in the amount of $105,000.  The Defendant filed the Cross-Complaint *pro se*.

*82.    In response to Form Interrogatory 15.1 propounded by the Defendant on the Plaintiff in the State Court Action, the Plaintiff vigorously disputed the merits of the Cross-Complaint.

*83.    The causes of action set forth in the Cross-Complaint were neither well grounded in fact nor supported by existing law.

*84.    Trial in the State Court Action was scheduled for October 30, 2006.

<u>The Bankruptcy Case</u>

*85.    On August 22, 2006, the Defendant filed a voluntary petition under chapter 7 of title 11 of the United States Code (Bankruptcy Case).

*86.    The first meeting of creditors was initially scheduled for September 25, 2006. After the resignation of the initial chapter 7 interim trustee, the meeting of creditors was rescheduled to October 23, 2006.  Kenneth A. Rushton is the duly appointed and acting chapter 7 trustee (Trustee).

*87.    The Bankruptcy Case has prevented trial from commencing in the State Court Action.

*88.    The Defendant filed Schedules and Statements that were executed under penalty of perjury.

89.    The Defendant did not list as assets any interests in real property and did not list any interest in the Zions Account on his Schedules and Statements.

90.    The Defendant disclosed to the Trustee details of the transactions involving the Newport Beach Property and the distribution of the sales proceeds.  He also disclosed the transactions regarding the various real properties, but denied having an equitable interest in the Utah properties.

91.     The Defendant supplied the Trustee with copies of his 2005 tax return which included disclosure of income from the Robert J. Lusk Trust, which is a sub-trust of the John D. Lusk Trust both of which are organized under and governed by California law.  The sub-trust known as the Robert J. Lusk Trust is referred to herein as the "Trust."  The Trustee compared the income on those returns with the income listed in the Defendant's Schedules and Statements and did not note any discrepancies that he considered material.  The Trustee was not provided with information regarding the total amount of funds paid by the Trust to the Defendant or to or for the benefit of his family.  The Defendant also provided the Trustee with a copy of the Trust documents.

92.     The Defendant did not turn over any postpetition Trust income to the Trustee.

93.     The Trustee did not request the turnover of any postpetition Trust income at any time prior to March 19, 2008.

94.     Nancy Lusk (one of the Trust trustees and the Defendant's mother) (Nancy Lusk or Trust Trustee) established and subsequently made contributions to 529 Education Plans for the benefit of the Defendant's children.

95.     The Defendant was aware of these 529 Education Plans at the time he filed his bankruptcy petition, but he was not aware of the amounts and the frequency of any contributions to those plans made by Nancy Lusk as Trust Trustee.

96.     The Defendant did not answer Questions 7 and 10 on his SOFA.  Specifically, the Defendant did not disclose any transfer or interest in the 529 Education Plans or the down payment for the purchase of the Highland Property.

<u>The Failure to Disclose the Cross-Complaint</u>

97.   The Defendant did disclose the existence of the State Court Action on his SOFA.

*98.   In his Schedules and Statements, the Defendant failed to disclose his affirmative causes of action set forth in the Cross-Complaint seeking damages of $105,000.

<u>The Defendant's Interest in the Trust</u>

*99.   On the petition date, the Defendant was the beneficiary of the Trust.

*100.   The Defendant's mother, Nancy Lusk, the Defendant's sister, Kristen Lusk, and an individual by the name of Norman Lilley serve as trustees of the Trust (collectively, the "Trust Trustees').

*101.   The Trust has readily identifiable liquid assets exceeding $1.3 million.

*102.   The Trust also owns a 14.0352% interest in Lusk Holdings, Inc.

*103.   Lusk Holdings, Inc. is a holding company that owns the shares of various companies previously operated by the Lusk family.  None of these companies are operating and all are in the process of winding down.  The value of the assets held by Lusk Holdings, Inc. and its subsidiaries presently consist of approximately $9.5 million in cash.  After resolution of potential liabilities including pending and threatened litigation, the Trust is entitled to 14.0352% of all remaining assets including the $9.5 million in cash.

104.   The Defendant was given little if any information about the Trust in the years preceding 2006, was not given an accounting of Trust distributions, and was given only the K-1's prepared by the Trust's accountants.  The Defendant was not knowledgeable about the provisions of the Trust or about the accounting of the Trust.

105.   The Defendant relied upon the Trust Trustees and accountants to provide him with accurate and correct information regarding the Trust.

*106.   The Trust contains a spendthrift provision.

*107.   Under Paragraph 3.51 of the Trust, a Trust Trustee on behalf of the Trust "shall distribute the entire net income of the Robert John Lusk Trust to or for the benefit of Robert John Lusk in quarterly or more frequent installments for her [sic] lifetime."

*108.   If the Defendant "needs additional funds for health, maintenance or support," a Trust Trustee on behalf of the Trust "may pay to him or expend for his benefit so much of the principal of the Robert John Lusk Trust as the Trustee deems appropriate for such purposes" pursuant to Paragraph 3.52 of the Trust.

*109.   During the four-year period prior to bankruptcy and continuing postpetition, the Trust paid various living expenses of the Defendant by making direct payments to such creditors from the Trust's net income otherwise payable to the Defendant.

*110.   The Defendant or Julie Lusk would provide information to the Trust Trustees to enable the Trust to make such payments for the benefit of the Defendant.

111.   It appears that Julie Lusk, who had at one time worked for Nancy Lusk, often supplied information to the Trust Trustees to obtain payment of family obligations and that the Defendant was not actively involved in these transactions.

112.   About the time the Lusks moved to Utah, Nancy Lusk became concerned about the family's financial condition, so she began making Trust distributions to the family based on her interpretation of the Trust's spendthrift provision.

*113.   At all times from and after March 2003, the Defendant has resided with his wife, Julie Lusk, and their children, Robbie, Jordan, McKenna, and Blake.

*114.   On Schedule B, the Defendant listed the value of his beneficial interest in the Trust as "unknown."

115.   The Defendant discussed the Trust with the Trustee at the meeting of creditors.

116.   In the years preceding the bankruptcy, the Trust Trustees were challenging the beneficial interests of some of the Trust beneficiaries.  There were also various managed funds under the Trust.

117.   At the time the Defendant filed this case, he had no knowledge of the value of his interest in the Trust.

<u>The Defendant's Income from the Trust</u>

*118.   In his SOFA, the Defendant disclosed the following income from the Trust: $11,000 in 2004; $11,000 in 2005; and $0 from January 1, 2006 through the August 22, 2006 petition date.

*119.   The amount of money paid by the Trust to or for the benefit of the Defendant during these years, however, was as follows: $12,655.13 in 2004; $52,642.54 in 2005; and at least $5,203.54[3] from January 1, 2006 through the August 22, 2006 petition date.

*120.   After the August 22, 2006 petition date, an additional $27,787.59 in Trust income for 2006 payable to the Defendant per Paragraph 3.51 of the Trust was distributed by the following checks executed by a Trust Trustee and drawn on a Trust checking account:

---

[3]   a.   Check 1161 dated March 5, 2006 payable to Golden State Scholar Share Trust in the amount of $813.14 for the benefit of the Defendant's daughter, McKenna Lusk;
   b.   Check 1162 dated March 5, 2006 payable to Golden State Scholar Share Trust in the amount of $813.14 for the benefit of the Defendant's son, Robert S. Lusk;
   c.   Check 1163 dated March 5, 2006 payable to Golden State Scholar Share Trust in the amount of $813.13 for the benefit of the Defendant's son, Blake Lusk;
   d.   Check 1164 dated March 5, 2006 payable to Golden State Scholar Share Trust in the amount of $813.13 for the benefit of the Defendant's son, Jordan Lusk;
   e.   Check 1165 dated March 23, 2006 payable to Steve Farrell in the amount of $500.00; and
   f.   Check 1166 dated July 7, 2006 payable to Brian Isaacson, DDS in the amount of $1,451.00.

| Check # | Payee | Memo | Amount |
|---|---|---|---|
| 1167 | Wm. Edward Isaacson, DDS | Dental for family | 618.00 |
| 1168 | Wm. Edward Isaacson, DDS | Robbie & Blake | 500.00 |
| 1169 | ARC | American Fork Hospital | 649.77 |
| 1170 | Stuart King, MD | | 241.76 |
| 1171 | Central Utah Medical Clinic | | 301.31 |
| 1172 | American Fork Hospital | Rob | 430.96 |
| 1173 | American Fork Hospital | Julie | 438.13 |
| 1174 | Lone Peak Anesthesia, LC | Julie 10/5/06 | 54.43 |
| 1178 | North Valley Emergency Phys. | Jordan (1/18) | 93.88 |
| 1179 | Paul H. Robinson | 1/18 | 606.08 |
| 1180 | American Fork Hospital | Robert (1/18) | 800.88 |
| 1181 | Central Utah Medical Clinic | Knee - Robbie (2/20) | 179.02 |
| 1182 | American Fork Hospital | Robbie (2/20) | 1,252.71 |
| 1183 | Lone Peak Anesthesia, LC | Rob & Robbie (2/20) | 279.78 |
| 1184 | Human Performance Institute | PT (2/21) | 60.00 |
| 1185 | Central Utah Medical Clinic | (2/21) | 25.00 |
| 1186 | Select Health | Premium - Rob (March/April 07) (2/24) | 1,007.12 |
| 1188 | North Valley Emergency Phys. | (2/28) | 47.64 |
| 1190 | Select Health | Premium - Rob (May 07 - April 09) | 13,000.00 |
| 1191 | Wm. Edward Isaacson, DDS | McKenna teeth | 500.00 |
| 1192 | Fidelity Investments | 529 plan - Robbie (616-761591) | 1,000.00 |
| 1193 | Fidelity Investments | 529 plan - Jordan (616-761605) | 1,000.00 |
| | Fidelity Investments | 529 plan - McKenna (616-761613) | 500.00 |
| | Fidelity Investments | 529 plan - Blake (616-761621) | 500.00 |
| 1196 | Robbie Lusk | City National Savings (41068190) | 250.00 |
| 1197 | Jordan Lusk | City National Savings (41068449) | 250.00 |
| 1198 | McKenna Lusk | City National Savings (41300225) | 250.00 |
| 1199 | Blake Lusk | City National Savings (402138963) | 250.00 |
| 1201 | Robert J. Lusk | 2006 income dist | 2,701.12 |
| TOTAL | | | 27,787.59 |

121.    Nancy Lusk's testimony, though confusing, was that the 2006 distributions referred to in paragraph 120 were actually advances on the Defendant's 2007 Trust income.

*122.    During and after 2007, the Trust has distributed or will distribute additional amounts of Trust income pursuant to Paragraph 3.51 of the Trust.

*123.    The payments referred to in Paragraphs 120 and 122 collectively are referred to as the "Trust Distributions."

*124.    The Defendant did not disclose any of the Trust Distributions to the Trustee.

125.    At some point in time, the Trust Distributions were disclosed to the Trustee resulting in the Trustee suing the Defendant on March 19, 2008 requesting turnover of the Trust Distributions.[4]  This adversary proceeding was eventually settled and dismissed.

From the above findings of fact, the Court makes the following conclusions of law.

### III.    CONCLUSIONS OF LAW

### A.    Plaintiff's Claims for Exception from Discharge Under § 523(a)(2)(A) and § 523(a)(6)

The Plaintiff has the burden of proof in establishing the elements of fraud under § 523(a)(2)(A) or willful and malicious injury under § 523(a)(6).  To prevail the Plaintiff must establish each of the requisite elements for either claim by a preponderance of the evidence.[5]  The preponderance standard requires the court to believe that the existence of a fact is more probable than its nonexistence before the court may find in favor of the party who has the burden to

---

[4]    The complaint filed in adversary proceeding 08-2062 also involved other allegations against other parties.

[5]    *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (10th Cir. BAP 1999) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

persuade the court of the fact's existence.[6]  The exceptions to discharge contained in § 523(a)

"are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to

be resolved in the debtor's favor."[7]

      1.    **Section 523(a)(2)(A)**

To establish that a claim is nondischargeable under § 523(a)(2)(A), a creditor must prove

the following elements: (l) the debtor made a false representation; (2) the debtor made the

representation with the intent to deceive the creditor; (3) the creditor relied on the representation;

(4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor

to sustain a loss.[8]

The Plaintiff alleges that he suffered a specific loss as a result of what he contends are the

following false representations made by the Defendant in late 2002 after the last of the Promissory

Notes was executed.  The Plaintiff claims that the Defendant asked him not to record the Deed of

Trust because (1) he would pay the Plaintiff with the Proceeds from the sale of the Newport

Beach Property after he arrived in Utah, (2) there was sufficient equity in the property to pay off

the amounts owed to the Plaintiff, and (3) that the recording of the Deed of Trust would

unnecessarily interfere with the sale of the Newport Beach Property and was unnecessary in order

for the Plaintiff to be paid.  The Plaintiff also testified that the Defendant made other

representations around the time the Original Note was signed and at other times thereafter

regarding the efficacy of the Deed of Trust and Julie Lusk's willingness to sign the Deed of Trust.

Finally, the Plaintiff argues that the Defendant was less than forthcoming in late 2002 when he

---

[6]    *Alside Supply Ctr. Salt Lake City, Div. of Alside Supply, Inc. v. Aste (In re Aste)*, 129 B.R. 1012, 1015 n.8 (Bankr. D. Utah 1991).

[7]    *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

[8]    *Young*, 91 F.3d at 1373; *see also Field v. Mans*, 516 U.S. 59, 70-72 (1995) (establishing that the appropriate standard is justifiable reliance instead of reasonable reliance).

promised the Newport Beach Property as collateral for repayment of the First Promissory Note,

yet he failed to disclose to the Plaintiff that he and Julie Lusk had entered into the Reconciliation

Agreement that effectively divested the Defendant of his interest in the Newport Beach Property.

The Plaintiff asserts that he relied on these representations, did not record the Deed of Trust and,

as a result, suffered a loss.  It is the Plaintiff's initial burden to present evidence establishing each

element of § 523(a)(2)(A), and the Court determines that the Plaintiff has failed to shoulder that

burden.

    The parties' representations about several of the key facts are in direct conflict.  The

Plaintiff testified that the Defendant made misrepresentations which the Defendant denies.  Faced

with this contradictory testimony, the Court must examine any objective facts and other

circumstantial evidence to determine whether the alleged representations were actually made and

if they were false.  That evidence is as follows.  The Plaintiff first loaned the Defendant money in

August 2001.  At that time, the parties executed the Deed of Trust.  The Deed of Trust (although

referenced in the Original Note and the First Promissory Note) was never recorded.  The

Promissory Notes referencing the Deed of Trust did not become due and payable until 2004 at the

earliest.  At the time the Defendant moved to Utah in March 2003, he was still trying to make

StudentAthlete successful.  The Plaintiff never made any formal demands for payment until he

filed the State Court Action.  When the Plaintiff finally sued the Defendant, the claims for relief

did not include allegations of fraud or a claim for enforcement of the Deed of Trust.  Taking into

consideration these facts and the surrounding circumstances, the Court has found that the

Plaintiff's testimony regarding the Defendant's alleged requests that the Plaintiff not record the

Deed of Trust was vague, illogical, and not credible.

    First, the Plaintiff claims that he attempted to obtain Julie Lusk's signature on the Deed of

Trust.  The Court finds this assertion not credible because there is no place for Julie Lusk to sign

on the Deed of Trust prepared by the Plaintiff.  Second, the Defendant supposedly asked the

Plaintiff not to record the Deed of Trust in late 2002 because the Defendant did not want to

complicate the sale of the Newport Beach Property.  Both the Plaintiff and the Defendant had

experience in real estate transactions.  The Plaintiff did not explain why recording the Deed of

Trust would complicate the sale in light of the equity in the property, nor did he explain to the

Court the Defendant's position on this point.  Next, the Promissory Notes did not become due at

the earliest until 2004, and it is not consistent that the Plaintiff would anticipate being repaid at

the time the Newport Beach Property was sold on Promissory Notes that did not come due until

well after the sale occurred.  Further, the Plaintiff asserts the Defendant promised repayment not

at the Newport Beach Property closing but at some unspecified future time once the Defendant

had resettled in Utah.  Had the Plaintiff really intended to enforce the Deed of Trust and to collect

from the Proceeds, he would have recorded his interest, especially in light of the fact that the

Promissory Notes did not mature until 2004 at the earliest.  Finally, the only objective evidence

the Court has regarding the parties' intent as it pertained to the Deed of Trust is the Plaintiff's

State Court Action filed in November 2005.  In the complaint, there is no mention of the Deed of

Trust and no allegations of fraud.  Yet, the Plaintiff was aware of the sale of the Newport Beach

Property in March 2003 and, thereafter, he took no steps to demand any portion of the Proceeds

or to otherwise demand payment until he served the Defendant with a state court complaint on

November 29, 2005, a period of over two years and eight months.  The Plaintiff did not send any

collection letters, emails, or other written forms of demand to the Defendant concerning the

obligation.  Further, the State Court Action makes no mention of the Deed of Trust, and the suit

is only a demand for payment on the Promissory Notes.

　　　　Therefore, based upon the objective evidence before the Court, the circumstantial

evidence presented, and the credibility of the witnesses, the Court finds that the Plaintiff did not

seek Julie Lusk's signature on the Deed of Trust and that the Defendant did not make a false

representation or commit actual fraud in connection with the failure of the Plaintiff to record the

Deed of Trust or pay the Plaintiff from the proceeds of the sale of the Newport Beach Property.

Further, the Court concludes that there is no credible evidence of the Defendant's intent to

defraud the Plaintiff.  Therefore, the Court concludes that the Plaintiff has simply failed to

establish the first three elements of § 523(a)(2)(A) by a preponderance of the evidence.[9]

In addition to the other three elements, the Plaintiff is charged with the duty of establishing

that his reliance on an representations was justifiable.  Although the Court has already determined

that the Defendant did not make the representations as alleged and that intent to defraud has not

been proven, the Court also finds that any reliance by the Plaintiff on these alleged representations

was not justifiable.  The Plaintiff explained that he and the Defendant had a friendly relationship,

that the Plaintiff had assisted the Defendant's family in previous successful business transactions,

and the Plaintiff was aware that the Defendant "came from money."  The Plaintiff indicated that at

the time the Defendant allegedly asked him not to record the Deed of Trust, he was sure the

Defendant had the ability to repay the debt.  But even if these explanations are accurate, the

Plaintiff's reliance upon those statements was not justifiable.  The Plaintiff is an experienced real

estate broker and is aware of the necessity of preserving an interest in real property through

recording.  The Plaintiff was a sophisticated and active participant to these transactions.  He

negotiated and drafted some of the initial documents himself.  It is simply not justifiable for such a

sophisticated participant to not record the Deed of Trust based on the Defendant's alleged

requests, even in light of the relationship between the parties.  Viewed as a whole, there is simply

---

[9]   The Plaintiff has also argued that as soon as the Defendant and Julie Lusk entered into the
Reconciliation Agreement, the Defendant knew that he would not have an interest in the Newport Beach
Property Proceeds and that any representation to the Plaintiff that he would be paid with those Proceeds was
fraudulent.  The Court has, however, found that such representations were not made.

insufficient evidence before the Court to support a conclusion that reliance upon the alleged false representations that purportedly resulted in the failure to record the Deed of Trust was justifiable under the circumstances.

### 2.    Section 523(a)(6)

The Plaintiff's claims against the Defendant under § 523(a)(6) are based upon the same facts as his claim for fraud.  Section 523(a)(6) excepts debts from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity," and the Plaintiff must prove that the alleged injury was both willful and malicious by a preponderance of the evidence.  As the United States Supreme Court has explained, the word "willful" in § 523(a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.[10]  In order to establish that the injury was willful, the Plaintiff must show that the Defendant knew of and intended to cause an injury either to the Plaintiff or to his property rights.  The Defendant testified that although he signed the Deed of Trust on August 6, 2001, he explained to the Plaintiff that Julie Lusk would not sign the Deed of Trust and the Defendant believed that the Deed of Trust might be an ineffective lien against the Newport Beach Property.  There is no evidence that the Defendant intended to keep the Plaintiff from receiving his money or to otherwise deliberately or intentionally injure the Plaintiff's property interest.  The Plaintiff has not established the requisite intent to support a claim for willful and malicious injury.

### B.    Plaintiff's Claims for Denial of Discharge Under § 727

The Plaintiff asserts that the Defendant is not entitled to a discharge under three provisions of § 727(a) of the Bankruptcy Code: (1) transfer or concealment of assets with the intent to

---

[10]    *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 61 (1998).

hinder, delay or defraud a creditor or the trustee under § 727(a)(2); (2) making a false oath or

account under § 727(a)(4); and (3) failure to explain the loss of assets under § 727(a)(5).  The

Plaintiff bears the burden of proof, and he must prove each element of § 727(a)(2), (a)(4), or

(a)(5) by a preponderance of the evidence.[11]

        1.      **Section 727(a)(2)**

In order to deny a discharge under § 727(a)(2), the Court must find that there is "*actual*

intent to defraud creditors."[12]  Because showing direct evidence of actual intent can be difficult,

fraudulent intent to conceal assets "may be established by circumstantial evidence, or by

inferences drawn from the course of conduct."[13]  The Plaintiff maintains that the Defendant

concealed the following assets: his vested interest in receiving income from the Trust and the

amount of income he received; his beneficial interest in the American Fork and Highland

properties; and his beneficial interest in the Zions Account and the use of funds in that account

after the sale of the Newport Beach Property.  The Plaintiff also alleges that the Defendant failed

to disclose the transfer of his interest in the Highland Property to Julie Lusk or Catherine Staker

within four months of filing, and that postpetition the Defendant failed to turn over Trust income

to the Trustee.  The Plaintiff maintains that if you examine these deficiencies in light of the

surrounding circumstances, a course of fraudulent conduct is displayed that establishes that the

Defendant concealed or transferred property of the Defendant or the estate with the intent to

hinder, delay, or defraud his creditors.

---

[11]   *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991).

[12]   *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991) (emphasis in original).

[13]   *Farmers Co-op Assoc. of Talmage, Kansas v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

### a.    Trust Income and Trust Value

The Defendant disclosed his interest in the Trust on Schedule B listing the value as

unknown.  When asked about the Trust, the Defendant complied with the Trustee's directive and

provided a copy of the Trust documents to the Trustee.  The Defendant did not conceal the

existence of the Trust, so the remaining issue is whether the Defendant concealed the value of the

Trust in an attempt to hinder, delay, or defraud his creditors.  Extensive testimony was given

regarding the value of the Trust.  Nancy Lusk testified that in the years preceding 2006, the

Defendant was given little if any information regarding the value of the Trust.  Also in the years

preceding the Defendant's bankruptcy, the Trust Trustees were challenging the beneficial interests

of various Trust beneficiaries and there were multiple managed funds under the Trust.  Prior to

filing, the Defendant was never given an accounting of Trust distributions like those found in

Defendant's Exhibit A.  He was given only the K-1s prepared by the Trust's accountants.

Without the assistance of the Trust Trustees, it would be difficult if not impossible for the

Defendant to guess at the value of his interest in the Trust.  The evidence shows that at the time

the Defendant filed for bankruptcy protection, he really had no idea what the value of his interest

was in the Trust.

The Plaintiff has also alleged that the Defendant concealed the actual distributions he

received from the Trust in an attempt to hinder, delay, or defraud creditors.  On his Schedules and

Statements, the Defendant disclosed that he had received $11,000 in Trust income in the calendar

year prior to filing.  The Defendant obtained this amount from the K-1 prepared and given to him

by the Trust Trustee and the Trust's accountant.  Despite the Defendant's representation on the

Schedules and Statements, an accounting of the distributions during the calendar year of 2005

shows that the Defendant actually received distributions for his or his family's benefit of

approximately $52,000 during that calendar year.  The Defendant explained the discrepancies

indicating that he relied upon the Trust Trustee and the Trust accountant to provide him with the

necessary and accurate information to accurately complete his Schedules and Statements because

he did not understand trust accounting.

The Defendant's explanations are supported by other evidence presented at trial.  The

Defendant had little to do with the administration of the Trust.  In the years prior to 2006, Nancy

Lusk interpreted a provision within the Trust as a spendthrift provision which gave the Trust

Trustees discretion regarding the Defendant's distributions.  Nancy Lusk was concerned about the

Defendant's financial condition after the Lusks moved to Utah in the spring of 2003, so she began

making Trust income distributions based on what she thought were expenses for the health and

welfare of the Defendant and his family.  This odd, if not inaccurate, interpretation of the

spendthrift provision and Nancy Lusk's direct distribution of Trust income to the Defendant's

creditors (and some distributions to the Defendant himself) continued until after the Defendant

filed his chapter 7 petition in August of 2006.  The evidence presented to the Court establishes

that the Defendant was not provided with regular accountings of his Trust income distributions

and that he has relied on the Trust Trustee and the Trust accountant for all of his information.

Viewing these facts together, the Court cannot impute any culpability that might arise due to

Nancy Lusk's odd interpretation of the spendthrift provision of the Trust and the lack of

accounting to the Defendant.  The Defendant disclosed what information he had on his Schedules

and Statements.  He relied upon the knowledge of the Trust Trustee and other professionals to

provide him with accurate information about the income from the Trust.  He was also not

involved with every transaction between Julie Lusk and the Trust for payment of family expenses.

It is completely plausible that the Defendant did not know and that he was not actually aware of

the amount of Trust income that had been distributed to him or on his behalf in the year prior to

filing for bankruptcy relief.  The explanations the Defendant provided as well as the testimony of

Nancy Lusk establish that the Defendant did not conceal the value of the Trust or the amount of the Trust income distributions in an attempt to hinder, delay, or defraud his creditors.

**b.    Beneficial Interests**

The Defendant failed to list any beneficial interest in the American Fork and Highland Properties and any beneficial interest in the Zions Account on his Schedules and Statements.  But when asked about real property at the meeting of creditors, the Defendant disclosed and explained his housing situation to the Trustee.  The Defendant told the Trustee that he and Julie Lusk had sold the Newport Beach Property about three-and-a-half years ago and that the Proceeds had been used as follows: a portion had been used for business debts and the establishment of a Wells Fargo Account for StudentAthlete; a portion for a down payment on the Alpine Property (which was placed in Julie Lusk's name only as part of the Reconciliation Agreement between the parties); and a portion was placed in the Zions Account for the family's living expenses.  At trial, the Defendant testified that he did not list any interest in any real property because any property owned by the Lusks after moving to Utah was placed in Julie Lusk's name based on the terms of the Reconciliation Agreement.  An important part of the Reconciliation Agreement was that the family would return to Utah and a home would be purchased in Julie Lusk's name only.  Julie Lusk wanted to make sure that she and her children would have a place to live regardless of whether or not the reconciliation was successful.  As a result, it was Julie Lusk who received the Proceeds of the Newport Beach Property and who purchased the Alpine Property in Utah.  After the Defendant transferred the Proceeds of the Newport Beach Property to Julie Lusk as part of their Reconciliation Agreement, he believed that he no longer had any interest in the Proceeds or the real property purchased with the Proceeds.

Julie Lusk purchased the American Fork Property and orchestrated the purchase of the Highland Property using money she had obtained.  The Defendant did not believe that he had any

interest in properties purchased with funds generated from the sale or refinance of the Alpine and American Fork properties, and he was not a party to the purchase of the Highland Property. Based on the Defendant's pattern of conduct after the sale of the Newport Beach Property and the fact that he thought only Julie Lusk had an interest in these properties, the Defendant's explanation for failing to disclose any beneficial interest he might have in the properties on his Schedules and Statements is plausible and capable of being believed. As a result, there is no indication that he concealed assets with the intent to hinder, delay, or defraud creditors.

The Defendant gave similar testimony regarding the Zions Account. For the three years between their move to Utah and the filing of the Bankruptcy Case, it was the practice of the Defendant to deposit any money he earned into the Zions Account. Pursuant to the Reconciliation Agreement, Julie Lusk controlled the funds in the account. It was critical to Julie Lusk that she control the family finances, although the Defendant did use and have access to those funds. The Defendant has run afoul of the cardinal rule that when in doubt, disclose, but the Court does not deem that misstep to rise to the level of fraud. The Defendant should have amended his Schedules and Statements to list any beneficial interest he had as of the date of the petition, but the Defendant was able to give the Court a plausible explanation for his failure to do so, i.e., the Zions Account had been in his wife's name since 2003, she was in control of those funds (although the Defendant did use the account), and he did not think he was required to disclose the Zions Account on his Schedules and Statements.

Also relevant to the Court's analysis is the timing of the transfers into the Zions Account. Within a year of filing his petition, the Plaintiff alleges that the Defendant deposited his earnings into the Zions Account in an attempt to hinder, delay, or defraud a creditor. The Defendant filed on August 22, 2006, so for any transfer to be actionable under § 727(a)(2), that transfer must have occurred on or after August 22, 2005. The Defendant may have deposited his earnings into

the Zions Account during this one-year period, but that had been the Defendant's course of

conduct since March 2003 when the family moved to Utah.  From that time forward, all of the

Defendant's money was handed over to Julie Lusk.  This went on for a period of over three-and-

a- half years before the Defendant filed his chapter 7 petition and well before the Plaintiff ever

filed the State Court Action seeking to recover the loans/investments from the Defendant.  The

Plaintiff has failed to establish that the Defendant depositing funds into an account under the name

of Julie Lusk since 2003 somehow was an attempt to hinder, delay, or defraud his creditors within

the year before the Defendant filed for bankruptcy protection.

### c.    Transfer of Real Property Interest

The Plaintiff contends that the Defendant transferred his interest in the Highland Property

to Julie Lusk and/or Catherine Staker within four months of filing for bankruptcy and that the

Defendant concealed this transfer in an attempt to hinder, delay, or defraud his creditors.  But

again, the Defendant did not believe that he had any interest in the Highland Property.  Both he

and Julie Lusk testified that the purchase of the Highland Property was her project, that the

Defendant wanted nothing to do with it, and that the Defendant's name was placed on purchase

documents erroneously.  This testimony is consistent with the conduct of the parties since their

move to Utah in 2003.  Julie Lusk orchestrated the purchase of the properties, the Defendant had

nothing to do with it, and he believed he had no interest in the Highland Property that he could

actually transfer to Julie Lusk or Catherine Staker.  It is not, therefore, remarkable that the

Defendant did not disclose any such transfer in his bankruptcy case.  Jacob Schoffe did testify that

the Defendant was involved in hiring him to finish the basement in the Highland Property, but

Jacob Schoffe also testified that Julie Lusk was involved as well.  The Defendant testified that he

was involved simply for the purpose of assisting his wife and that he did not claim or assert any

interest in the Highland Property.  The fact that the Defendant was involved in assisting his wife in

hiring and overseeing the basement build-out does not lend itself to a conclusion that he believed

or even asserted that he had an interest in the Highland Property that needed to be disclosed.  The

evidence presented just does not support a finding that the Defendant actually intended to transfer

property in an attempt to hinder, delay, or defraud his creditors.

### d.    Postpetition Turnover

The Plaintiff urges this Court to deny the Defendant's discharge under § 727(a)(2)

because he failed to turn over his Trust income to the Trustee postpetition.  But the Trustee never

requested that the Defendant do so until March 2008.  The Trustee was aware of the income

distribution provision, but he made no demand upon the Defendant or the Trust Trustees for

turnover of any income.  Nancy Lusk testified that the Trust Distributions were advances on the

Defendant's 2007 income distributions from the Trust and that distributions were made to the

Defendant pursuant to the spendthrift provision.  As a result, the Plaintiff has failed to prove that

any postpetition distributions from the Trust to the Defendant were property of the estate.

The Plaintiff has attempted to show that the Defendant engaged in a pattern of

concealment from the time he and his family moved to Utah in 2003 until he filed for bankruptcy

in 2006 and that the Defendant engaged in this pattern of continued concealment in an attempt to

hinder, delay, or defraud his creditors.  The Defendant has been able to adequately explain why he

failed to disclose certain transactions and beneficial interests and otherwise promptly and candidly

disclosed his and his family's circumstances when asked.  Though the Schedules and Statements

are not entirely accurate, such conduct and omissions are insufficient to show a course of conduct

that would require this Court to deny the Defendant his discharge.

### 2.    Section 727(a)(4)

Under Section 727(a)(4)(A), "a creditor must demonstrate by a preponderance of the

evidence that the debtor knowingly and fraudulently made a false oath and that the oath relates to

a material fact."[14]  "A debtor will not be denied discharge if a false statement is due to mere

mistake or inadvertance . . . .  Moreover, an honest error or mere inaccuracy is not a proper basis

for denial of discharge."[15]  Once the Plaintiff has established that a false oath has been made

regarding a material fact, it is incumbent upon the Defendant to provide a credible explanation for

his actions.[16]  The Plaintiff has identified the following as alleged false oaths: (1) the Defendant's

failure to list any beneficial interest in the Highland and American Fork properties; (2) the

Defendant's failure to list his beneficial interest in the Zions Account; (3) failure to properly value

his beneficial interest in the Trust; (4) failure to disclose the Cross-Complaint against the Plaintiff

in the State Court Action; (5) failure to correctly disclose his total income on Question 1 of his

SOFA; and (6) failure to accurately answer Questions 7 and 10 of the SOFA, i.e., the Defendant's

failure to disclose the 529 Education Plans and the funds used to purchase the Highland Property.

Denial of a debtor's discharge is appropriate when a debtor's actions demonstrate a "series or

pattern of errors and omissions," and a debtor is unable to give plausible explanations regarding

those omissions that are capable of being believed.[17]  For many of the reasons articulated in the

§ 727(a)(2) portion of this opinion, the Court finds that the Plaintiff has failed to carry his burden

of proof on these points because he did not prove that the Defendant made these omissions

knowingly and fraudulently.

　　　As to omissions (1), (3), and (4), the Court has already found that the Defendant

attempted to rectify these omissions early in the bankruptcy process when he explained them to

---

[14]  *First Nat'l Bank, Larned v. Davison*, no. KS-04-013, 01-23974-7, 02-6018, 2004 WL 2852352, *3 (10th Cir. BAP June 29, 2004) (citing *Gullickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1294 (10th Cir. 1997)).

[15]  *Gullickson* 108 F.3d at 1295-6 (internal citations omitted).

[16]  *Trustee v. Halishak (In re Halishak),* 337 B.R. 620, 627 (Bankr. N.D. Ohio 2005).

[17]  *Id.* at 626.

the Trustee and otherwise provided the Trustee with additional documentation.[18]  The Court has

already examined the facts surrounding omissions (2) and (5), i.e., whether the Defendant's failure

to accurately report the 2005 trust distributions (resulting in an inaccurate statement on SOFA

Question 1) and failure to disclose his beneficial interest in the Zions Account rose to the level of

fraud.  The Court found that it did not and in turn finds that the omissions were plausibly

explained by the Defendant and, as a result, cannot be the basis for a knowing and fraudulent false

oath.  That leaves the Defendant's failure to correctly answer Questions 7 and 10 on his SOFA as

the basis for a § 727(a)(4) denial of discharge.

Question 7 requires a debtor to list all gifts or charitable contributions made within one

year of filing.  Question 10 requires the debtor to "[l]ist all other property, other than property

transferred in the ordinary course of the business or financial affairs of the debtor, transferred

either absolutely or as security within one year immediately preceding the commencement of this

case."  As to the 529 Education Plans, the Defendant knew that the 529 Education Plans existed,

but he did not know how much of the Trust income had been contributed to those plans.  The

testimony from both Nancy Lusk and the Defendant was that Nancy Lusk set up, contributed to,

and administered these plans.  Based on the Defendant's limited knowledge of the Trust and any

distributions, it is not surprising that the Defendant failed to list the 529 Education Plans on his

Schedules and Statements.

The Plaintiff also asserts that the Defendant should have listed the funds used as a down

payment on the Highland Property on his SOFA.  The Defendant explained that he did not list the

transfer of funds because it was not his money, and he had nothing to do with the purchase of the

Highland Property.  The Defendant's testimony is nothing if not consistent.  After the parties

---

[18]   *See Gullickson*, 108 F.3d at 1295 (finding that a pattern of non-disclosure did not arise when the
debtor promptly and of his own accord rectified an omission regarding an omitted vehicle).

moved to Utah in 2003, Julie Lusk assumed financial control of the family funds.  She made the

financial decisions for the family.  She decided when to take out loans and when to purchase

properties.  She communicated with Nancy Lusk when the family needed extra money.  The

Defendant's position that he was not involved in any financial transaction involving the Highland

Property is consistent with his perception of the family's financial arrangements.  The Defendant

did not knowingly or fraudulently fail to disclose this transfer.  He honestly did not think that he

had any obligation to do so.

The Plaintiff has been able to point to a few omissions made by the Defendant on his

Schedules and Statements.  But the Defendant has provided this Court with plausible explanations

regarding those omissions that are believable based on the facts and circumstances of this

particular case.  The Plaintiff has not shown that the omissions were made knowingly,

fraudulently, or even with a reckless disregard for the truth.  For these reasons, the Court finds

that the Plaintiff has not shouldered his burden of establishing the necessary elements of

§ 727(a)(4).

### 3.    Section 727(a)(5)

Section 727(a)(5) requires this Court to deny the Defendant's discharge if he has failed

to satisfactorily explain any loss of assets or deficiency of assets to meet his liabilities.  The

§ 727(a)(5) claim requires this Court to examine whether the Defendant's explanation

satisfactorily describes what happened to assets, not whether what happened to assets was

proper.[19]  In support of the legal claims set forth above, the Plaintiff has directed the Court's

attention to the Defendant's transfer of his interest in the Proceeds of the Newport Beach

---

[19]    *Shappell's, Inc. v. Perry* (*In re Perry*), 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000); *Buckeye Retirement Props. of Indiana, LLC v. Tauber* (*In re Tauber*), 349 B.R. 540, 564 (Bankr. N.D. Ind. 2006) (stating that, for purposes of § 727(a)(5), "the debtor does not need to justify the wisdom or prudence in the disposition of assets").

Property to Julie Lusk and her subsequent use of the Proceeds to purchase a series of homes in

Utah; the Defendant's deposit of his earnings during the period 2003 through 2006 in the Zions

Account; the failure to disclose the Cross-Complaint; and the Defendant's failure to adequately

disclose his interest in the Trust.  The Court has already examined the Defendant's explanations

regarding these assets and has found that the Defendant has adequately explained his financial and

economic position before and after 2003.  As part of the Reconciliation Agreement, the Defendant

turned over all financial management decisions to his wife Julie Lusk.  Julie Lusk determined what

the family should do with its income, how the Proceeds from the sale of the Newport Beach

Property would be used, how the funds from the refinances of the Alpine property should be used,

and ultimately whether the family should make major purchases such as the American Fork and

Highland properties.  There is just no evidence that supports the Plaintiff's claim that the

Defendant picked up the sale Proceeds and moved to Utah to avoid the Plaintiff.  Furthermore,

the Defendant and Julie Lusk have produced over 500 pages of documents attempting to

demonstrate what happened to the Proceeds.  These documents trace the Proceeds into the homes

purchased by Julie Lusk in Utah, the use of the proceeds of subsequent refinances of those

properties to support the Lusk family, and the deposit of the Defendant's modest earnings into the

Zions Account pursuant to the Reconciliation Agreement.  The Defendant has satisfactorily

explained the use of these proceeds and any dissipation of assets.

  With respect to the Cross-Complaint asserted by the Defendant against the Plaintiff in the

State Court Action, the Defendant was acting without the assistance of counsel, and the Plaintiff

has admitted that the Defendant's Cross-Complaint was neither well grounded in fact nor

supported by existing law.  Finally, although the Cross-Complaint was not listed as an asset on

Schedule B, the Defendant did disclose the existence of the lawsuit in response to Question 4 of

the SOFA, and there is no evidence to suggest that the Defendant was trying to conceal an asset from the Trustee or his creditors.

The Plaintiff also attempts to deny the Defendant his discharge based upon the existence of the Trust.  The Defendant's interest in the Trust was plainly disclosed in Schedule B filed with the Court.  The Defendant was unaware of the actual value of the assets in the Trust at the time the Bankruptcy Case was filed.  Furthermore, the Trustee received a copy of the Defendant's 2005 tax return, including Schedule B to the federal tax return which disclosed interest and dividend income from the Trust.  The Trustee also received a copy of the trust documents from the Defendant's bankruptcy counsel.  Prior to March 19, 2008, the Trustee had never made an oral or written demand to the Defendant or any Trust Trustees for turnover of any income or other interest in the Trust.  Simply put, any loss of assets has been adequately explained to the Court.  Therefore, the Court denies the Plaintiff's request for denial of the Defendant's discharge under § 727(a)(5).

For the foregoing reasons, the Court finds that the Plaintiff has failed to establish the requisite elements of his claims for relief under § 523 and § 727, and the Court therefore denies those requests for relief.  A separate order will be issued.

-------------------------------------- END OF DOCUMENT --------------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** will be effected through the Bankruptcy Noticing Center to each party listed below.

D. Edward Hays
c/o Marshack Hays LLP
5410 Trabuco Rd, Ste 130
Irvine, CA 92620
        *Counsel for Plaintiff*

Leslie W. Slaugh
Howard, Lewis & Petersen, P.C.
120 East 300 North
P.O. Box 1248
Provo, UT 84603
        *Local Counsel for Plaintiff*

Joel T. Marker
McKay Burton & Thurman
170 South Main Street
Suite 800
Salt Lake City, UT 84101
        *Counsel for Defendant*

Daniel J. McCarthy
300 South Grand Ave. 37th Floor
Los Angeles, CA 90071
        *Counsel for Defendant*

Kenneth A. Rushton
P.O. Box 212
Lehi, UT 84043
        *Chapter 7 Trustee*